IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No.  02-cv-00988-REB-MJW**

RONALD J. JANOUSHEK,

Petitioner,

v.

GARY WATKINS, et al.,

Respondents.

---

**RECOMMENDATION ON APPLICATION FOR A WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY**

---

**MICHAEL J. WATANABE
United States Magistrate Judge**

This case is before this court pursuant to a Order of Reference to United States

Magistrate Judge issued by District Judge Robert E. Blackburn.  (Docket No. 8).

Before the court is the pro se incarcerated petitioner's Application for a Writ of

Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (Docket

No. 3) as supplemented (Docket Nos. 21 and 23).  The respondents timely filed an

Answer (Docket No. 15) and Supplemental Answer (Docket No. 27), and the petitioner

filed a Traverse.  (Docket No. 16).  Upon order of this court, the Clerk of the District

Court of Adams County, Colorado, provided to this court the original written record

(Vol. 1 - 19; our Docket No. 35) and Exhibits 35A and 35B (Vol. 20; our Docket No.

37) of Adams County Case No. 92CR1394, <u>People v. Ronald J. Janoushek</u>.  The

2

court has reviewed that record, including the trial transcript, and has very carefully

listened to the tape recording of petitioner's interview with the police.  The court now

being fully informed makes the following findings, conclusions, and recommendation.

In his petition, the petitioner challenges a judgment of conviction entered in the

District Court of Adams County upon a jury verdict finding him guilty of first degree

murder for which he was sentenced to life without the possibility of parole.  The

Colorado Court of Appeals (hereinafter "CCA") affirmed in an unpublished opinion,

People v. Janoushek, (Colo. App. No. 93CA1991, Aug. 14, 1997) (Resp. Ex. C), and

the Colorado Supreme Court en banc denied the petitioner's Petition for Writ of

Certiorari on June 29, 1998 (Resp. Ex. F).  The mandate was issued on July 17, 1998

(Resp. Ex. G).

Petitioner's motion for post-conviction relief pursuant to Colo. Crim. P. 35(c) and

supplemental 35(c) motion were denied by the District Court of Adams County on

August 20, 2000.  The CCA affirmed that ruling in an unpublished decision on

November 23, 2001 (Resp. Ex. K), and the Colorado Supreme Court denied certiorari

on April 15, 2002 (Resp. Ex. O).  The mandate issued on May 3, 2002 (Resp. Ex. P).

The CCA summarized the evidence in this case as follows:

[Petitioner] shot the victim during the course of an argument
outside the rear entrance of a bar.  There were no witnesses to the
shooting.

At trial, the following evidence was presented.  At the time of her
death, the victim had been romantically involved with [petitioner] for one
or two months.  Several witnesses testified that they had seen [petitioner]
and the victim arguing in the weeks before the incident.

3

On the night of the shooting, the victim and [petitioner] had a brief conversation at the bar at around 9:00 p.m.  The victim remained at the bar, and [petitioner] left, returning at approximately 1:30 a.m.  Upon his return, he parked his car immediately behind the victim's car at the rear entrance to the bar.  [Petitioner] and the victim spoke briefly inside the bar, then went outside on the back steps.  The bartender heard their raised voices and asked them to quiet down.  A few minutes later, the bartender heard [petitioner] pounding on the rear door, went outside, and discovered the victim's body.

An autopsy indicated that she had died instantly as a result of a gunshot wound from a bullet that entered her neck and traveled upward into her brain.  Based on the type of the entry wound, the coroner concluded that the gun had been forced hard against the victim's neck before firing.

The victim's scalp also bore a two-inch long laceration that was consistent with a blow from a rounded object.  According to the coroner, that wound had occurred immediately before or after the victim's death.

Police took [petitioner] into custody at the scene and interviewed him at 4:30 that morning.  Both at the time of his arrest and during the interview, [petitioner] was sobbing.  Police detected a slight odor of alcohol from [petitioner] but did not perform any alcohol testing.

At the beginning of the interview, a police detective read [petitioner] an advisement of his rights to remain silent and to counsel.  [Petitioner] stated that he understood his rights and that he wished to speak to police without a lawyer present.  He also signed the advisement form, stating as he did so, "I don't have an attorney."

During the interview, a recording of which was played for the jury at trial, [petitioner] said that he and the victim had been arguing ouside the bar, and that during the argument he had retrieved a revolver from his car.  According to [petitioner], he placed the gun to his own head and then to the victim's head, at which point she performed "one of them karate things," causing the gun to go off.

The court gave the jury instructions on the charge of first degree murder after deliberation, as well as the lesser included offenses of second degree murder, reckless manslaughter, and criminally negligent homicide.  The court also delivered [petitioner's] tendered instruction on the affirmative defense of intoxication.  This instruction directed the jury to

4

consider whether, because of intoxication, [petitioner] "did not have the capacity to form the specific intent" required for first degree murder.  The conviction at issue here resulted.

(Resp. Ex. C at 1-3).

Petitioner raises the following fifteen claims for habeas corpus relief:

(1) there was insufficient evidence to support a finding that he acted after deliberation, intentionally causing death, in violation of due process of law;

(2) reversible plain error occurred when the prosecutor in closing argument misrepresented the existence of physical evidence to support the element of "after deliberation;"

(3) petitioner was deprived of his constitutional right to present a defense because of the trial court's erroneous reliance on an over-ruled state case to exclude the expert testimony of Dr. Gary Forrest;

(4) petitioner's right to due process of law was violated when he was not allowed a continuance to present exculpatory evidence at trial through the testimony of Dr. Gary Forrest;

(5) petitioner's right to due process of law was violated by the State's failure to collect blood samples from him and by the destruction of evidence on the exterior and interior of the petitioner's car, especially in light of the State's exploitation of its failure to preserve evidence;

(6) the trial court erred in failing to suppress the petitioner's statement to the police since the record fails to show that he voluntarily and intelligently waived his Miranda right to appointed counsel;

5

(7) the trial court violated the petitioner's right to a fair trial in its handling of the evidence of his audio-taped statement to police;

(8) petitioner was denied a fair trial when the jury did not hear all of the evidence since they could not hear defense counsel;

(9) petitioner was deprived of his constitutional right to be present when the court conducted part of the trial proceedings outside his presence;

(10) petitioner was deprived of his right to confrontation when the trial court allowed the State to introduce the victim's hearsay statements and evidence of her character;

(11) reversible constitutional plain error occurred when the jury was improperly instructed on "after deliberation" and the affirmative defense of intoxication;

(12) petitioner was deprived of a fair trial when the trial court failed to *sua sponte* instruct the jury as to the lesser offense of heat of passion manslaughter;

(13) the cumulative effect of prosecutorial misconduct deprived the petitioner of a fair trial;

(14) the cumulative effect of error deprived the petitioner of his constitutional right to a fair trial; and

(15) the jury was not instructed that evidence of voluntary intoxication can negate the "after deliberation" portion of the specific intent of first degree murder.

Petitioner raised the first fourteen claims in his direct appeal to the CCA, and his last claim was raised in his 35(c) motion.  When petitioning for certiorari before the Colorado Supreme Court, however, petitioner raised just claims two, three, five, six,

6

seven, and one part of claim four as specific issues presented for review.  All of his first

fourteen claims for habeas relief were then raised as bases for his final claim in his

certiorari petition in which he asserted that the cumulative effect of error undermined

the reliability of the verdict and deprived him of the fair trial to which he is entitled under

the due process clauses of the state and federal constitutions.  Even if the petitioner's

presentation of some of his habeas claims as mere bases for one of his claims to the

state's highest court does not constitute adequate exhaustion of his state court

remedies, pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas

corpus may be denied on the merits, notwithstanding the failure of the applicant to

exhaust the remedies available in the courts of the State."  "Where, as here, the

claim has no merit, it will be denied without requiring useless state-court litigation to

accomplish the exhaustion rule."  Janke v. Novac, 42 Fed. Appx. 107, *110 (10th Cir.

May 28, 2002) (citing Hoxsie v. Kerby, 108 F.3d 1239, 1242-43 (10th Cir. 1997)).

"The Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"]

modified a federal habeas court's role in reviewing state prisoner applications in

order to prevent federal habeas 'retrials' and to ensure that state-court convictions

are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693

(2002).  "Under AEDPA, 'federal habeas review of state convictions is limited when

the state courts have adjudicated a claim on the merits.'"  Parker v. Scott, 394 F.3d

1302, 1308 (10th Cir. 2005).

More specifically, 28 U.S.C. § 2254 now provides in pertinent part:

(d) An application for a writ of habeas corpus on behalf of a person in

custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

> (e) (1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d), (e)(1).  With regard to § 2254(d)(1), the U.S. Supreme Court

has stated that

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. . . .  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. . . .  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. . . .  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* [*v. Taylor*, 529 U.S. 362, 409-10 (2000),] that an unreasonable application is different from an incorrect one. . . . See also *id.*, at 411 . . . (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

Bell v. Cone, 535 U.S. at 694.

8

"Avoiding these pitfalls does not require citation of [Supreme Court] cases-indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002).  "Furthermore, under § 2254(d)(1), the only 'federal law' [the court] consider[s] is 'clearly established federal law as determined by decisions, not dicta, of the Supreme Court.' . . .  Thus, 'an absolute prerequisite for [a habeas petitioner's] claim is that the asserted constitutional right on which it rests derive in clear fashion from Supreme Court precedent.'"  Parker v. Scott, 394 F.3d at 1308.

With the above standards in mind, this court will review the petitioner's fifteen claims for habeas corpus relief.

**(1) Insufficient Evidence.**  In his first claim for habeas relief, the petitioner asserts that in violation of due process of law there was insufficient evidence to support a finding that he acted after deliberation, intentionally causing death.  He contends that:

> [a]s the trial transcripts clearly depict, on the night of the shooting, [he] and the victum [sic] spoke <u>cordially</u> to each other at the Brighton Bar, once when the Petitioner stopped by at approximately 9:30 p.m. and again when he came back at approximately 1:30 a.m. . . .  There was nothing unusual or aggresive [sic] or loud about their discussions in the bar . . . .  In fact, there is no evidence that the Petitioner's return to the Brighton Bar at 1:30 a.m. was anything other that [sic] fortiutous [sic].
>
> When the Petitioner returned to the Brighton Bar, he spoke to a few people and did not seem angry.  The Petitioner had started to <u>leave the bar by himself when the victum [sic] asked him to wait up and followed him out the back door</u> . . . .  While on the bar's back porch, they began to raise their voices, though no witnesses heard what they said.  The bartender, Ms. Jenkins (victum) [sic] good friend Rejeana, asked them to quiet down.  Ms. Jenkins assured her they would and that she would be

right back . . . .  Shortly thereafter, Ms. Jenkins was fatally shot and the Petitioner immediately banged frantically on the bar door, seeking help. He was hysterical . . . .  Clearly, the evidence here **does not** support a finding that the Petitioner acted after deliberation to intentionally cause the death of Ms. Jenkins.  As a result, the Petitioner was deprived of his constitutional right to due process of law.

(Pet. at 5-6) (emphasis in original) (citations to record omitted).

The CCA disagreed with the petitioner's contention that the trial court erred in denying his motion for judgment of acquittal on the charge of first degree murder, which was based upon his assertion that the evidence at trial was insufficient to prove that he deliberated before shooting the victim.  (Resp. Ex. C at 3).  The court stated in pertinent part:

In determining the sufficiency of evidence to sustain a conviction, a reviewing court must ascertain whether the evidence, viewed as a whole in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crimes charged beyond a reasonable doubt.

. . .

The evidence adduced at trial, and the inferences a juror might reasonably draw from that evidence, establish the following: that defendant returned to the bar at closing time with the knowledge that the victim would be there; that he parked his car in such a way as to block her car from leaving the parking lot; that he entered the bar and engaged the victim in conversation; that an argument ensued, during which defendant and the victim went outside to where their vehicles were parked; that defendant retrieved a gun from a carrying case in his car; that he used the gun to hit the victim on the head; and that he shot the victim at point-blank range in the neck, with the muzzle of the gun forced upwards below her jaw.

Viewed in the light most favorable to the prosecution, this evidence is sufficient to convince a rational juror beyond a reasonable doubt that defendant deliberated before killing the victim.  The court therefore did not err in denying defendant's motion for acquittal.

10

(Resp. Ex. C at 4-5).

"In advancing this argument, [petitioner] faces a high hurdle."  Patton v. Mullin, 425 F.3d, 788, 796 (10th Cir. 2005), cert. denied sub nom. Patton v. Sirmons, 126 S.Ct. 2327 (2006).  The Supreme Court has held that a 28 U.S.C. § 2254 petition challenging the sufficiency of evidence must be granted "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979).  The evidence should be reviewed in the "light most favorable to the prosecution," id. at 319, and the jury's resolution of the evidence should be accepted "as long as it is within the bounds of reason."  Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993).  It is the "'responsibility of the trier of fact [not this court] fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  Patton v. Mullin, 425 F.3d at 796 (quoting Jackson v. Virginia, 443 U.S. at 319)).  "Moreover, the AEDPA adds an additional degree of deference to state courts' resolution of sufficiency of the evidence questions. . . .  Thus, the question before [this court] is whether the [CCA's] conclusion that the evidence was sufficient constituted an unreasonable application of the Jackson standard."  Id.

Having very carefully reviewed the record, including the entire trial transcript and the tape recording of the petitioner's interview with the police, this court agrees with the CCA that the trial evidence was sufficient to convince a rational juror beyond a reasonable doubt that the petitioner deliberated before killing the victim.  The evidence adduced at trial, and the inferences a juror might reasonably draw from that evidence,

11

establish what the CCA found above, namely, that the petitioner returned to the bar at

closing time with the knowledge that the victim would be there; he parked his car in

such a way as to block the victim's car from leaving the parking lot; he entered the bar

and engaged the victim in conversation; an argument ensued, during which the

petitioner and the victim went outside to where their vehicles were parked; petitioner

retrieved a loaded gun from a carrying case which was inside his car; he used that gun

to hit the victim on the head; and he shot her at point-blank range in the neck, with the

muzzle of the gun forced upwards below her jaw.  With regard to the latter two actions,

this court notes the testimony of Dr. Robert Deters, the Chief Coroner in Laramie

County, who performed the autopsy of the victim in this case, namely, his testimony

concerning the perimortem scalp injury (e.g., Vol. 15, pp. 57-59; p. 61, lines 16-19); and

the "tight contact wound" to the neck (Vol. 15, p. 55, lines 9-11; p. 81, line 13; see Vol.

15, p. 56, lines 4-13, 17-23; p. 57, lines 1-5).

This court finds that the state court's conclusion that the evidence was sufficient

to support the petitioner's conviction was not contrary to or constitute an unreasonable

application of the Jackson standard, nor does the court's decision represent an

unreasonable determination of the facts in light of the evidence.  Therefore, habeas

relief is not warranted on this claim.

**(2) Prosecutor's Closing Argument.**  Petitioner next asserts that "reversible

plain error" occurred when in the closing argument the prosecutor misrepresented the

existence of physical evidence to support the element of "after deliberation."  Petitioner

asserts that

12

> [t]here was evidence of a laceration on the top of Ms. Jenkins' head, but no evidence as to its cause, other than conjecture and speculation. Notwithstanding an utter lack of evidentiary support, the prosecutor asserted during his rebuttal closing, that there was proof [petitioner] acted "after deliberation," because the physical evidence established he first struck Ms. Jenkins over the top of her head with the gun to immobilize her and then placed the gun to her neck and shot. The prosecutor claimed the blow to the head occurred first, because Ms. Jenkins' hair could be seen on a photograph of the gun . . . . This argument was made despite the fact that the alleged hair on the gun was never tested and there was not even any testimony that there was hair on the gun. Such prosecutorial misconduct constitutes reversible plain error when it so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.

(Pet. at 6) (citation to record omitted).

The CCA was unpersuaded that "misconduct warranting reversal occurred when the prosecutor stated in closing argument that the fiber visible in a photograph of the gun was the hair of the victim, and that this hair constituted 'proof beyond a reasonable doubt that [defendant] used that gun to hit [the victim] over the head and immobilize her before he murdered her." (Resp. Ex. C at 6). The court found:

> There was no evidentiary foundation for the prosecutor's argument to the jury that the fiber depicted in the photo of the murder weapon was the victim's hair. The fiber itself was not preserved, and no tests were conducted upon it. Other than the photograph, there was simply no evidence concerning the fiber. The prosecutor's statement was therefore improper.

> Defendant, however, failed to object to the prosecutor's comments at trial; accordingly, we apply a plain error standard of review. Crim. P. 52(b). Because we cannot say with fair assurance that this improper argument so misled the jury as to cast serious doubt on the reliability of the verdict, we conclude that reversal is not warranted.

> An inference that defendant struck the victim with the gun before shooting her was reasonable even in the absence of any evidence concerning the purported hair. Such an inference could be drawn from

13

the character of the victim's scalp wound, the evidence that the wound was sustained immediately before or after the victim's death, and the absence of any other object in the area that could have inflicted such a wound.  As described above, there was other evidence supporting the jury's finding that defendant acted with deliberation.

We also note that the jury was instructed that closing arguments of counsel are not evidence.  Under these circumstances, the prosecutor's comments, though improper, did not rise to the level of plain error requiring reversal of defendant's conviction. . . .

(Resp. Ex. C at 6-7).

"When a defendant asserts claims of prosecutorial misconduct in a habeas petition, those claims are reviewed for a violation of due process."  Hamilton v. Mullin, 436 F.3d 1181, 1187 (10th Cir. 2006).  "To be entitled to relief, a defendant must establish that the prosecution's conduct or remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' . . .  Such a determination may be made only after 'tak[ing] notice of all the surrounding circumstances, including the strength of the state's case,'" Id.  (citations omitted), "as well as '[a]ny cautionary steps-such as instructions to the jury-offered by the court to counteract improper remarks.'"  Bland v. Sirmons, – F.3d –, 2006 WL 2171516, *19 (10th Cir. Aug. 3, 2006).  "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutor's conduct."  Id.

"Because the [CCA] considered this claim, AEDPA standards of review apply, and [this court] may reverse only if the [CCA's] decision was 'legally or factually unreasonable.'"  Bland v. Sirmons, – F.3d —, 2006 WL 2171516 (10th Cir. Aug. 3, 2006).  As noted by the CCA, the jury was instructed that closing arguments of counsel

14

are not evidence.  "Such instructions may minimize the impact of a prosecutor's misstatements."  Thornburg v. Mullin, 422 F.3d 1113, 1134 (10th Cir. 2005) (citing Darden v. Wainwright, 477 U.S. 168, 182 (1986) (jury instructions that "their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence" helped remedy prosecutor's improper closing argument)).

Furthermore, even if the prosecutor's argument about the fiber on the gun was not a reasonable inference from the evidence, that misstatement did not deprive the petitioner of a fair trial.  A review of the record supports the CCA's finding that "[a]n inference that [petitioner] struck the victim with the gun before shooting her was reasonable even in the absence of any evidence concerning the purported hair.  Such an inference could be drawn from the character of the victim's scalp wound, the evidence that the wound was sustained immediately before or after the victim's death, and the absence of any other object in the area that could have inflected such a wound. As described above, there was other evidence supporting the jury's finding that defendant acted with deliberation."  Once again, this court notes in particular the testimony of Dr. Deters concerning the perimortem scalp injury (e.g., Vol. 15, pp. 57-59; p. 61, lines 16-19).  In addition, Mool Verma, a forensic anthropologist agent for the Colorado Bureau of Investigation who was received as an expert in the filed of forensic trichology - hair and fiber analysis, testified that a clump of 16 head hairs from the victim, which was found on the victim's shirt, had substantial damage to the shaft of all of the hairs, which was consistent with a trauma cause by a "partly blunt, partly sharp object," such as a firearm.  (Vol. 14, p. 140, lines 5-10, 17-18).

15

In sum, this court finds that the CCA's conclusion was not contrary to or involved an unreasonable application of clearly established federal law, nor did it result in an unreasonable determination of the facts presented in the state court proceeding. Therefore, habeas relief is not warranted based upon the prosecutor's statement during closing argument.

**(3) Trial Court's Reliance on Over-Ruled Case.**  Petitioner next asserts that the trial court erroneously relied on an overruled state case, namely, People v. Bieber, 835 P.2d 542 (Colo. App. 1992), rev'd, 856 P.2d 811 (Colo. 1993), to find that since the petitioner had not entered an insanity plea or asserted the affirmative defense of impaired mental condition ("IMC"), Dr. Gary Forrest, who purportedly is an expert in alcohol studies, could not testify regarding petitioner's chronic alcoholism and its effects on him.[1]  Petitioner states that he sought to call Dr. Forrest to testify about the

---

[1]With respect to this claim, the CCA found:

[A] correct decision will not be disturbed on review even though the reason given for it may appear to be incorrect. . . .  Hence, the trial court' reliance on People v. Bieber, supra, is immaterial.  The issue remains whether the court properly excluded the proffered testimony, regardless of its rationale for doing so.

In that regard, defendant argues the expert testimony concerning chronic alcoholism should have been admitted because it tended to negate an element of the offense, even though defendant's level of impairment did not rise to the level of insanity or impaired mental condition.  We do not agree.

In People v. Requejo, 919 P.2d 874 (Colo. App. 1996), a division of this court held that a defendant could present expert testimony that because he was a "slow thinker" he had not noticed that his friend had pulled out a knife during a fight and had stabbed the victim.  This mental characteristic of being "slow" did not rise to the level of insanity or

16

petitioner's degree of intoxication at the time of the shooting, various mental

characteristics petitioner has when sober which address his thinking process, and the

petitioner's mental condition "which is not terribly far from the normal" and "doesn't rise

to the level of psychosis" but that "alcohol will affect the Petitioner differently than it

would affect the average person."  (Pet. at 6(a)).  Petitioner asserts that "[t]he trial

court's reliance on overruled authority seriously impaired its exercise of discretion in

excluding Dr. Forrest's testimony and as such, deprived the Petitioner of his right to

present a defense."  (Pet. at 6(a)).

    The court finds that habeas relief is not warranted based upon this claim.

Simply stated, "[f]ederal habeas courts will not . . . review issues of purely state law . . .

."  Dockins v. Hines, 374 F.3d 935, 940 (10th Cir. 2004) (citing Estelle v. McGuire, 502

_____

   impaired mental condition but nevertheless, tended to negate an element
   of the offense, i.e., the defendant's ability to perceive that murder was
   being committed.  The division therefore held the evidence admissible
   independent of the affirmative defenses of insanity and impaired mental
   condition.

      Here, defendant's proffered testimony on chronic alcoholism differs
   fundamentally from the testimony at issue in Requejo.  Defendant does
   not claim that his alcoholism prevented him from perceiving that he was
   shooting the victim.  Rather, his proposed testimony related to whether he
   formed the requisite mental state to commit murder.

      Under §18-1-804, as interpreted by our supreme court in Bieber v.
   People, supra, the voluntary ingestion of alcohol, either in the short or
   long term, cannot constitute a defense to a criminal charge of general
   intent.  In light of that holding, defendant's proffered testimony was
   inadmissible, and the trial court did not err in excluding it.

(Resp. Ex. C at 11-13).

U.S. 62, 67-68 (1991)).

   **(4) Denial of Continuance.**  Petitioner asserts that his right to due process of

law was violated when he was not granted a continuance to present exculpatory

evidence at trial through the testimony of Dr. Gary Forrest.  In support of his claim, he

asserts the following.  Upon hearing the court's ruling that excluded Dr. Forrest's

testimony in the absence of an insanity plea or assertion of an IMC defense, defense

counsel immediately requested a continuance so that he could assert an IMC defense,

even though counsel informed the court of his belief that the petitioner did not suffer

from an IMC as he understood that term was defined by statute.  The State objected to

any continuance, and the court denied the petitioner's request for one since the IMC

statute "indicates that the defense should be raised at the time of arraignment or [as]

soon thereafter as good cause would require" and the petitioner had had Dr. Forrest's

report available to him for a number of months.  (Pet. at 6(a)).  Petitioner asserts that

"[c]learly, the court's ruling was reversible error of constitutional magnitude, since it

failed to balance the Petitioner's right to present a defense against any prejudice to the

State arising from the requested continuance."  (Pet. at 6(a)).

   The CCA disagreed with the petitioner's assertion that he should have been

granted a continuance.  The court noted that a decision to grant or deny a continuance

is within the trial court's discretion, which may not be disturbed on appeal absent a

clear abuse of discretion which prejudices the defendant.  (Resp. Ex. C at 13).  The

court stated:

          [h]ere, we reject defendant's suggestion that the trial court's ruling

was "unexpected."  The record indicates that the expert's findings had been available to the defense for a considerable time prior to trial.  There was no reason defendant could not have previously asserted the affirmative defenses in question.

Moreover, in light of our conclusion that defendant's proffered expert testimony was inadmissible in any event, we perceive no abuse of discretion in the court's denying defendant's motion for a continuance.

(Resp. Ex. C at 13).

The Tenth Circuit has held that "when a denial of a continuance forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion, but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process. . . .  There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process." Case v. Mondragon, 887 F.2d 1388, 1396 (10th Cir. 1989) (quoted by Clemons v. McKune, 2006 WL 1532014, *2 (10th Cir. June 6, 2006)).  The court should focus on the petitioner's "need for a continuance and the prejudice or lack of prejudice resulting from its denial, in the context of a fundamental fairness evaluation." Id. at 1397.  See Scott v. Roberts, 975 F.2d 1473, 1476 (10th Cir. 1992) (setting forth some factors to be considered to determine whether the denial of a motion for continuance is so arbitrary as to violate due process: (1) the diligence of the movant; (2) the likelihood that the purpose underlying the expressed need for the continuance would be accomplished by granting it; (3) the inconvenience likely to be suffered by the opposing party, its witnesses, and the court by granting it; and (4) the reason asserted for the continuance and the harm the movant might suffer as the result of a denial).

Upon review of the record, this court cannot conclude that the trial court's denial of the petitioner's request for a continuance was so arbitrary and fundamentally unfair that it violated constitutional principles of due process.  Petitioner was not diligent in requesting the continuance.  The request was made on the first day of trial, and as noted by the trial court and the CCA, the record indicates that Dr. Forrest's findings had been available to the defense for a considerable time prior to trial, and there was no reason the petitioner could not have previously asserted the IMC defense in question.  Furthermore, even the petitioner noted in his petition that his attorney advised the court that the petitioner did not suffer from an IMC as he understood that term was defined by statute.  Therefore, as respondents assert, it was extremely unlikely that a continuance to develop an IMC defense was likely to achieve its purpose.  In addition, since the motion was made on the first day of trial, a continuance would have been an extreme inconvenience for the court, the prosecution, and the witnesses.

This court concludes that the state court's resolution of this issue did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in an unreasonable determination of the facts presented in the state court proceeding.  Therefore, habeas relief is not warranted based upon the court's denial of a continuance on the first day of trial.

**(5) State's Failure to Collect Petitioner's Blood and Its Destruction of Evidence.**  Petitioner next contends that his right to due process of law was violated by the State's failure (1) to preserve a sample of his blood so that it could be tested for blood alcohol level which would conclusively establish his level of intoxication at the

time of the shooting and (2) to preserve the exterior and interior of his car.  The police had taken his car into custody but had exposed the exterior to inclement weather and failed to preserve the interior of the car by releasing the car to petitioner's brother in violation of the court's order granting the defense's request to preserve the car and evidence it contained.

"Under Youngblood [Arizona v. Youngblood, 488 U.S. 51 (1988)], a defendant can establish a due process violation if he can show that (1) the government failed to preserve evidence that was 'potentially useful' to the defense; and (2) the government acted in bad faith in failing to preserve the evidence." Riggs v. Williams, 87 Fed.Appx. 103, 106 (10th Cir. Jan. 21, 2004) (citing Youngblood, 488 U.S. at 58), cert. denied, 541 U.S. 1090 (2004).   "[T]he inquiry into bad faith 'must necessarily turn on the police's knowledge of the exculpatory value of the evidence." Id. (citing Youngblood, 488 U.S. at 57 n. *).  However, the "mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." Id. (quoting United States v. Bohl, 25 F.3d 904, 910 (10th Cir. 1994)).  "This is true even if the government acted negligently . . . or even intentionally, so long as it did not act in bad faith."  Id.  Petitioner here has not established that the police stored the petitioner's car and eventually released it to the petitioner's brother as part of a bad faith attempt by the government to destroy its potential exculpatory value or that the lack of blood alcohol level testing was the result of bad faith.

**Blood Alcohol Level.**  Following a hearing, the trial court made the following ruling regarding the petitioner's blood:

21

As to the blood alcohol, the test is whether or not, in fact, the failure to investigate creates request for sanctions.  The Colorado courts, appellate courts, have at least been confronted with the issue as to whether or not, in fact, blood, alcohol, or the failure to take blood alcohol is a destruction of evidence and that court has determined that it is not a destruction of evidence, but a failure to investigate which is a different type of situation. Police officers are not required to investigate possible defenses for a defendant in a criminal prosecution.  Although there may be a number of factors which would place the police on notice of the fact that the defendant may have been drinking, that does not, in and of itself, require the police departments to take a blood alcohol, and under the circumstances as set forth in this particular case, the Court would find that there was no requirement upon the police to investigate, to take a blood alcohol; that it does not fall within destruction of evidence, and the Court will not impose any sanctions.

(Vol. 3, pp. 252-53).

On direct appeal, the CCA reviewed the way for a defendant to show that the

failure to preserve evidence violated the right to due process and then determined that

"the failure by the police to test defendant's blood alcohol level did not constitute a

violation of his right to due process of law."  (Resp. Ex. C at 16).  The court stated that

[p]olice detectives testified that, although defendant emitted a slight odor of alcohol, he appeared coordinated and able to follow instructions.  They attributed the redness of his eyes and the irregularity of his speech to his level of emotional upset, rather than to intoxication.  In the course of his interview with police, defendant stated that he had had only "a couple drinks" at the bar.  Review of the tape recording of defendant's interview bolsters the view that defendant was emotionally upset, rather than drunk, after the incident.

These circumstances indicate that the evidence of defendant's blood alcohol level on the night of the shooting did not have an exculpatory value that was apparent at the time.  We therefore conclude that the evidence does not satisfy the "constitutional materiality" test of People v. Greathouse, . . .

Rather, defendant's blood alcohol level was the type of evidence which may have had exculpatory value upon further testing.  Such

> evidence is appropriately analyzed under the bad faith standard as applied in People v. Eagen, . . .  The record does not indicate that police acted in bad faith in failing to conduct a test of defendant's blood level.

> Using this same analysis, courts in other jurisdictions have reached similar conclusions in evaluating claims that the failure to test the blood of a murder suspect violates due process. . . .

(Resp. Ex. C at 15-16).

A review of the record establishes that as noted by the CCA, police detectives testified that although the petitioner emitted a slight odor of alcohol (Vol. 13, p. 39, line 11 - "slight odor;" p. 56, lines 14-18 - "nothing that really stood out;" p. 72, lines 5-7; 134, lines 22-25 - "slight odor;" Vol. 14, p. 39, lines 15-16), he appeared coordinated (e.g., Vol. 13, p. 40, lines 23-25; pp. 72-73; Vol. 14, p. 24, lines 12-14), and able to follow instructions (e.g., Vol. 13, p. 60, line 25; p. 135, lines 15-16). See Vol. 13, p. 39, lines 12-14 (aside from slight smell of alcohol, no other signs of alcohol consumption were observed).  In addition, the police witnesses attributed the redness of the petitioner's eyes and the irregularity of his speech to his level of emotional upset, rather than to intoxication.  (See Vol. 14, p. 47).  Also, in the course of his interview with police, he stated that he had had only a couple drinks at the bar.  (See Vol. 14, p. 72, line 7; p. 78, lines 1-17; p. 80, lines 1-6; and petitioner's statement to the police - our Docket No. 37).  This court further notes that when asked why he didn't "do a blood or breath test on [petitioner] at the outset," Detective Scott Grose, who was the lead investigator in this case, responded, "I didn't feel that [petitioner] was intoxicated." (Vol. 14, p. 47, lines 5-7; see p. 48, lines 10-11 - "Again, there were no other signs of intoxication so it did not occur to me to draw blood at that time.").

23

Based upon the above, the evidence of the petitioner's blood alcohol level on the night of the shooting did not have an exculpatory value that was apparent at the time, and petitioner has not shown that the failure of the police to have his blood alcohol level tested was the result of bad faith.  Furthermore, according to Youngblood, "the police do not have a constitutional duty to perform any particular tests." Youngblood, 488 U.S. at 59.  Therefore, this court finds that the state court's conclusion concerning the lack of blood alcohol level testing did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in an unreasonable determination of the facts presented in the state court proceeding.  There is thus no basis upon which to grant the petitioner's Application with regard to this claim.  See United States v. Weise, 89 F.3d 502 (8th Cir. 1996) (no due process violation where police failed to administer blood alcohol test on a murder suspect who appeared to be in control of his thoughts and actions at the time of his arrest).

**Petitioner's Car.**  With regard to the petitioner's car, the respondents note the following.  (Answer at 16-17).  The vehicle was photographed and impounded by the Brighton police at the time of the petitioner's arrest on August 30, 1992.  It was kept in a garage for a few days until it became an obstruction and was moved outside.  The City did not normally store cars inside because there was no place to do so.  When it was moved outside, a protective covering was left over it for a couple of weeks. Representatives of the Public Defender's office, who were accompanied by Sergeant Chavez, inspected the car from the outside upon their request on September 28, 1992.

24

They were not permitted to enter the car until someone who was knowledgeable about the case authorized them to go inside the vehicle.  On October 15, 1992, they obtained a court order permitting them to look at the interior.

About one month later, on November 12, 1992, the petitioner's brother contacted Detective Grose and asked if he could get his hat out of the car.  Believing the Public Defender's Office had already viewed the car because he was aware that a request had been made to do so, and Seargeant Chavez had told him that they had inspected the car, Detective Grose authorized the release of the car to the petitioner's brother, who picked it up that day.

Representatives from the Public Defender's Office finally inspected the inside of the car on December 8, 1992, which was almost two months after they obtained the court order authorizing such inspection.  Petitioner's brother testified that he had not taken anything out of the car, but he had taken it on a trip to Idaho.

Following a hearing, the trial court made the following findings with respect to the petitioner's car:

> As to the car, the testimony presented at least as to the exterior of the car, was that it was impounded that night, taken to an impound area, kept in a locked inside facility overnight so photographs could be taken. That it was then moved to an outside lot, and that it was removed to an outside lot because there was no place for the car to be kept.  It is not encumbant [sic] upon the police or the prosecuting attorney to build an impound lot to an inside facility for the protection of a car just because it might have some evidentiary value and may have some exculpating evidence.
>
> The testimony presented, at least at this hearing, was that there was no facility in which the car could be kept and protected.  That the testimony was that it was kept in a maintenance facility, it would have to

be moved every day so that other cars would be worked on, and that it was part of the maintenance shop and part of the police department.

Under[] [t]he circumstances, the failure to preserve the outside of the car would at least be determined, by this Court, not to be a destruction of evidence; that there was no failure to preserve.  The Court would also note that the car was taken into possession on August 30; that the defendant appeared before this court did [sic] on August 31 and the public defender was appointed at that time.  The evidence, as presented to this Court, was that the public defender did not attempt to view the car until September 29, I believe.

. . .

I am aware of [People v. Sheppard, 701 P.2d 49], but the situation here is a different situation in which any destruction that occurs, occurs because of the weather and not because of the actions of the district attorney or the police authority; and under those circumstances where it is the weather only which may destroy the outside evidence which may be in the car, on the car, the Court would determine that that is not a failure to protect and the Court will not impose sanctions.

The interior of the car, however, is a different situation.  In this particular case, there was a protective interior of the car and it was capable of being protected, as the police officers have indicated by either taping the doors shut or any–or just locking the doors.  But in this particular case, defense counsel attempted to view the interior of the car and was not allowed to do so.  The failure to allow the defendant to investigate the interior of the car at that time may have been a nonwillful violation, because of the testimony of Sergeant Chavez that he was not the officer in charge and was not aware of the case and felt not his right or authority to allow defense counsel to view the interior, and that may be correct.

However, on October the 15th of 1992, there was a specific order entered by this Court authorizing defense counsel the right to view the interior of the–of the vehicle; that the district attorney was present when the Court entered that order on October 15, and subsequent to the order authorizing entry by defense counsel, the car was turned over to a third party, not the defendant, nor defense counsel.

The problem is that this particular case and with the order is, obviously, there was a failure to comply with the Court order which in

26

> essence is a willful or bad faith on the part of the prosecution and the
> police; however, the interior of the car was not a crime scene and there
> has been no indication as to what, if anything, relevancy there is in the
> interior of the car other than the gun which was removed at the time the
> car was seized. . . .

(Vol. 3, pp. 253-57). The court then gave defense counsel ten days to suggest an

appropriate remedy (Vol. 3, pp. 257-58), but like the respondents, the court has been

unable to find any other mention of the court's ruling in the record.

The CCA, however, also perceived no error due to the failure of the police to

preserve the exterior and interior of the petitioner's car for inspection and testing by the

defense. The court noted that '[i]n order for the destruction of evidence to constitute a

violation of due process, the evidence in question must have at least potentially

exculpatory value." (Resp. Ex. C at 17). The court then found:

> [h]ere, defendant has not shown that the interior of the automobile could
> have had any potentially exculpatory value for the defense. On appeal,
> defendant urges for the first time that the inside of the car might have
> been an alternative source of the fiber visible on the barrel of the gun in
> one of the photographs. However, the prosecution did not present any
> evidence at trial concerning the nature or source of the fiber.
>
> In the absence of any such evidence, the origin of the fiber was
> thus not a genuinely contested issue in the case, despite the fact that the
> prosecution made improper assertions during closing argument
> concerning this fiber. Again while the prosecutor's reference to the fiber
> as the hair of the victim was improper, that argument was not evidence,
> and the jury was so instructed.
>
> We thus conclude that, because the evidence in question has not
> been shown to have even potential exculpatory value, its destruction did
> not violate defendant's due process rights.

(Resp. Ex. C at 18).

Upon review of the record, this court finds that the petitioner has not shown a

violation of <u>Youngblood</u> with respect to his vehicle.  Petitioner has not shown that his car even had potential exculpatory value.  <u>See</u> <u>Torres v. Mullin</u>, 317 F.3d 1145, 1161 (10th Cir. 2003).  Furthermore, there has been no showing that the government acted in bad faith in failing to preserve the car.

In sum, this court finds that the CCA's conclusion concerning the petitioner's car did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in an unreasonable determination of the facts presented in the state court proceeding.  Therefore, there is no basis upon which to grant the petitioner's Application with regard to this claim.

**(6) Failure to Suppress Petitioner's Statement.**  Petitioner contends that the audiotape of his <u>Miranda</u> advisement prior to his statement to the police clearly shows that the State did not meet its burden of establishing that he understood his right to consult with an attorney before speaking with the police and his right to have an attorney appointed for him if he could not afford to hire one himself.  Petitioner asserts that "[i]n fact, said audiotape clearly devulges [sic] the Petitioner's intoxification [sic] and the Police Detective's taking advantage of the situation.  Also, the Petitioner never signed the portion of the Miranda advisal [sic] form that would indicate he understood his right to counsel, despite the interrogating officer's request to do so."  (Pet. at 6(c)).

After a hearing, the trial court made the following ruling with respect to the plaintiff's statement to the police:

> Matter does come before the Court on motion to suppress statement which was given by the defendant.  The evidence in this case is that on August 30, 1992, the Brighton Police Department was dispatched

to the Brighton Bar.  When the officers arrived there, Officer Bare was informed that shots had been fired and a person was lying in the rear of the location.  The officer then contacted Mr. Janoushek, and Mr. Janoushek was identified as the individual who had fired the shots.

The officer observed a victim lying by a car belonging to Mr. Janoushek.  Mr. Janoushek was then arrested, taken into custody, and taken to the Brighton Police Department.

Approximately an hour after he arrived at the Brighton Police Department, he was then removed from the cell and taken into an interrogation room, where he was questioned by Detective Grose.  The indications are that this was a small room, approximately 8x8 feet, with one large mirror.  That Officer Grose took off the handcuffs of Mr. Janoushek and that they faced one another.  Officer Grose was not sure on the stand whether or not he was or was not armed at the time. However, he indicates that at no time did he ever remove his weapon, if he had one, or threaten the defendant.

The interview was tape recorded, and this Court had the opportunity yesterday to review the tape.  It's obvious, from a review of the tape, that the defendant was emotional and at times broke down. However, that is not the issue that is before the Court.  The issue before the Court is whether or not in fact the defendant was given his <u>Miranda</u> warnings, and did he waive his rights and proceed to testify, whether or not in fact the statements were voluntarily given.

Having reviewed the tape and the testimony of Detective Grose, Detective Grose indicated that the defendant had a mild odor of alcohol; that he did not slur his speech; his eyes did not appear to be watery; however, he was emotional and was crying during periods of time during the interview.  Officer Grose also indicated that the defendant indicated to him that he wanted to talk about what had happened at the Brighton Bar. He was then advised of his <u>Miranda</u> rights, and during one period of time during that advisal the defendant did make a comment, when they were talking about lawyers, that he did not have one.  But the rights, as given to the defendant, consist of," You have the right to remain silent. Anything you say can and will be used against you in a court of law.  You have the right to talk to a lawyer and have one present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you."  And it was approximately at this time that there was a discussion concerning lack of an attorney.

There was then some indication by the officer that, well, we have to go through the rights before you can testify or make a statement, or something to that effect, and then, these rights are continuing rights and you may choose to exercise them at any time.  And then, "Having these rights in mind, do you wish to talk to us now without the presence of a lawyer?"  As I say, there was some discussion prior to that concerning the fact that Mr. Janoushek wanted to discuss and clear up the issue.  The <u>Miranda</u> waning itself is a full and proper <u>Miranda</u> Warning.

The issue is whether or not in fact the defendant intended or in any way indicated that he wanted to exercise his right to remain silent.  The Court would find, after reviewing the tape and the statements of the detective, that the discussion concerning a lawyer was not one having to do with the fact that the defendant wanted to exercise his right to remain silent, but was rather just a comment having to do with the fact that he did not have a lawyer.  It appears that the defendant understood that he did not have to speak without the presence of a lawyer and that he was willing to give up that right.  Under <u>People v. Connelly</u>, it is necessary, if in fact the Court were to suppress the statement, it find there was an element of coercion on the part of the police department to cause the defendant to waive his rights and to testify.

I agree with defense counsel, it isn't an issue to much of misconduct, as whether or not in fact there was an overcoming of the will of the defendant.  In this particular case the Court would find that in fact that did not occur.  There is on the tape some discussion concerning two beers at the Brighton Bar.  There's also a discussion on the tape about the fact that the defendant did not remember certain facts or indicated that he did not remember certain facts, but that does not, in and of itself, establish the fact that the defendant was not in a position, because of alcohol or otherwise, to understand the rights that he was giving up.  A review of the tape, at least, would assist the Court, together with the testimony of Detective Grose, that the defendant did understand the rights that he was giving up; he understood the content or context of the discussion which was taking place.

The Court would find, by a preponderance of the evidence, that the statement was voluntarily given, not as a result of any threats or coercion.  The Court would further find there was a proper and full <u>Miranda</u> warning and the Court would find that the defendant did freely and voluntarily give up his rights.

There may be another issue concerning not only intoxication or

30

> alcohol, but also the fact that this interrogation lasted approximately one hour to one hour and a half; it started about 4:30 in the morning and the testimony was that the defendant had worked that day.  The shooting took place a little after midnight and then it continued until 4:00 in the morning, so the defendant was up approximately twenty-some hours.  The Court would find that that fact does not, in and of itself, establish that the statement was not voluntary, and the Court will deny the motion to suppress the statement.

(Vol. 4, pp. 9-13).

The CCA did not agree that the trial court erred by not suppressing the evidence of the petitioner's interview with police on the night of the shooting.  The court stated that "the record indicates that the trial court applied the proper legal standard and found that the prosecution had shown by the preponderance of the evidence that defendant was not subjected to any police coercion and that he gave his statement to police freely and voluntarily.  Our review of the record of defendant's interview and the written advisement form he signed reveals competent evidentiary support for these determinations.  We will therefore not disturb them on appeal."  (Resp. Ex. C at 20-21).

The CCA also disagreed with the petitioner's assertion that at the time he signed his written waiver of the right to counsel, he made an ambiguous request for an attorney and that the police should have asked for a clarification before continuing with the interview.  (Resp. Ex. C at 21).  The court stated:

> as he was signing the written advisement form, defendant commented, "I don't have an attorney."  The trial court ruled that this statement did not constitute an ambiguous request for counsel, and that the police were therefore not required to limit their questioning to a clarification of his statement.
>
> On review of the record, we agree with the trial court that defendant's statement was simply a comment on the fact that he did not

have an attorney rather than a request - - even an ambiguous one – that
an attorney be appointed.  We therefore perceive no error in the trial
court's ruling on the motion to suppress.

(Resp. Ex. C at 21-22).

"The Fifth Amendment to the United States Constitution guarantees that no

person can be compelled to testify against him or herself in a criminal case. . . .  A

confession or admission made during custodial interrogation, but in the absence of

legal counsel, can be admitted against a criminal defendant only if the defendant has

waived his constitutional rights."  Abeyta v. Estep, 2006 WL 1061955, *5 (D. Colo. Apr.

20, 2006)  (citations omitted).  "In order to be effective, a waiver must be made

'voluntarily, knowingly, and intelligently.'"  Smith v. Mullin, 379 F.3d 919, 932 (10th Cir.

2004) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  "The Supreme Court

has held that a court's inquiry into a waiver's validity 'has two distinct dimensions,'"

namely:

>First, the relinquishment of the right must have been voluntary in the
>sense that it was the product of a free and deliberate choice rather than
>intimidation, coercion, or deception.  Second, the waiver must have been
>made with a full awareness of both the nature of the right being
>abandoned and the consequences of the decision to abandon it.  Only if
>the totality of the circumstances surrounding the interrogation reveal both
>an uncoerced choice and the requisite level of comprehension may a
>court properly conclude that the *Miranda* rights have been waived.

Id. at 932-33 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

In this case, as noted above, the trial court found by a preponderance of the

evidence that the petitioner's statement was voluntarily given, not as a result of any

threats or coercion; that there was a proper and full Miranda warning; and that the

32

petitioner freely and voluntarily gave up his rights.  The CCA found that there was

competent evidentiary support for these determinations.  Upon review of these rulings,

the record, and the tape recording of the petitioner's interview with the police, this court

finds that the state court's decision is neither contrary to, nor an unreasonable

application of, any decision of the United States Supreme Court.

Furthermore, no evidentiary hearing is required of this claim.  This court

presumes the trial court's factual findings are correct, and the petitioner has identified

no clear and convincing evidence to rebut them.  This court cannot conclude that the

trial court's factual findings were unreasonable in light of the evidence presented.  The

court agrees with the respondents that the totality of the circumstances show that the

petitioner was responsive to the requests and questions of the police and that he gave

appropriate answers to the questions asked of him.  He acknowledged his

understanding of the <u>Miranda</u> advisement and verbally waived those rights and signed

a written waiver.  While he did state at one point that "I don't have an attorney," in

context, there was nothing ambiguous about that statement.  As the state courts found,

that rather than being a request for counsel, even an ambiguous request, that

statement was simply a comment on the fact that the petitioner did not have an

attorney.  Furthermore, upon listening to the tape recording, this court does not agree

with the petitioner that it "clearly devulges [sic] the Petitioner's intoxification [sic] and

the Police Detective's taking advantage of the situation."  As the CCA stated earlier in

its decision, "[r]eview of the tape recording of [petitioner's] interview bolsters the view

that [petitioner] was emotionally upset, rather than drunk, after the incident."  (Resp. Ex.

C at 15).  Based upon the above findings, habeas relief is also not warranted on this claim.

**(7) Trial Court's Handling of the Evidence of Petitioner's Audio-taped Statement.**  Petitioner alleges error due to the trial court's refusal to allow his statement to the police to be mentioned during his attorney's opening statement to the jury.  The prosecutor had advised the court that he had not yet decided whether to introduce the statement, and the court ruled that the statement was inadmissible hearsay unless offered by the state.  Therefore, the defense was barred from mentioning it during opening remarks.

According to the petitioner, his attorney renewed his request to mention the statement during his opening after the prosecutor mentioned during his opening that the petitioner brought a "fully loaded" .38 caliber gun with him to the Brighton Bar, which petitioner claims was a fact that was available only through his statement to the police in which he admitted that he kept the gun loaded in his car.  The court, however, denied that request, ruling that the fact the gun was loaded could be inferred without reference to the petitioner's statement.

Petitioner asserts that the ruling

was error and seriously prejudiced the ability of the defense to make an effective opening statement.  In fact, the prosecution introduced the statement early in its case and relied on it in closing . . . .  It is difficult to believe that the prosecution did not know on the first day of trial whether it would introduce the Petitioner's statement in its case in chief, especially since there were no witnesses to the shooting other than the accussed [sic] and the gunshot residue tests of the victums' [sic] hands were inconclusive.  Without the Petitioner's lengthy statement, very little linked him to the gun or the shooting.  Given the importance of opening

34

statements, the prosecution's good faith in seeking to prevent the defense from referring to this critical piece of evidence is suspect.

The trial court's ruling . . . was also flawed by its erroneous determination that the statement, although admissable [sic] if offered by the State, would be inadmissable hearsay if offered by the defense.  For example, it is clear that the Petitioner is highly emotional throughout the statement and that the statement related to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.  Thus, the statement would be admissable [sic] as an excited utterance under CRD803(2).  It was also admissable [sic], if offered by the defense, to show the Petitioner's emotional state after the shooting and thus rebut the notion that the killing of Rose Jenkins was an intentional and deliberative act.

(Pet. at 6(c)-(d)).

The CCA did not agree with the petitioner's contention that the trial court erred in

various ways in its handling during trial of his interview with police.  (Resp. Ex. C at 22).

The court stated in pertinent part:

Given the court's uncertainty at that junction as to whether defendant's interview would be offered by the prosecution, its limitation on the defense's opening statement was not an abuse of discretion.

Defendant argues on appeal that the interview could have been admitted at the behest of the defense as an excited utterance, under CRE 803(2), or as an expression of defendant's then-existing mental or emotional condition, pursuant to CRE 803(3).  However, the record does not indicate that defendant presented these arguments to the trial court.  Therefore, absent a showing of plain error, these contentions are not properly preserved on appeal. . . .

If material excluded from an opening statement is admitted in evidence, defendant can claim no prejudice to his rights. . .  Here, defendant's interview with police was admitted into evidence.  Also, defendant had an adequate opportunity to address it in closing argument.  Thus, we find no plain error.

(Resp. Ex. C at 23).

35

"Evidentiary rulings by a state court cannot serve as the basis for habeas corpus relief unless the ruling rendered the petitioner's trial fundamentally unfair resulting in a violation of due process." Brewer v. Northern Dist. of Okla. Mike Mullin, 169 Fed.Appx. 517, **2 (10th Cir. Feb. 27, 2006) (citing Duckett v. Mullin, 306, F.3d 982, 999 (10th Cir. 2002); Fox v. Ward, 200 F.3d 1286, 1296-97 (10th Cir. 2000) (stating that to justify habeas relief, a trial court's evidentiary error must be "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process")).  "Because a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks and citations omitted).  The court's "[i]nquiry into fundamental unfairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner . . . [and] [a]ny cautionary steps-such as instructions to the jury-offered by the court to counteract improper remarks . . . ." Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002).

In the instant case, this court cannot conclude that the alleged error in the evidentiary ruling "was 'so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process.'" Bullock v. Carver, 297 F.3d 1036, 1055 (10th Cir. 2002) (citation omitted).  As noted by the CCA, petitioner's statement to the police was admitted into evidence, and the petitioner had an adequate opportunity to address it in closing argument.  The state court's decision was not contrary or an unreasonable application of established federal law, nor did it result in

36

an unreasonable determination of the facts presented in the state court proceeding.

Consequently, this claim does not warrant habeas relief.

**(8) Jury's Inability to Hear Defense Counsel.**  Petitioner next asserts that he

was denied a fair trial because the jury did not hear all of the evidence because they

could not hear defense counsel.  According to the petitioner, the judge advised defense

counsel at the close of the State's case that the jury had sent the court a note

requesting that defense counsel speak up since they could not hear him.  Petitioner

contends that "[t]he fact that the jury could not hear defense counsel during critical

cross-examination of witnesses deprived the Petitioner of a fair trial . . . .  The jury's

verdict is not reliable since the jury was deprived of essential evidence brought out

through cross-examination.  This is especially so in light of the prosecution's reliance

on non-existent evidence in closing argument."  (Pet. at 6(d)).

The CCA was not persuaded by the petitioner's argument that he was deprived

of his right to a fair trial because his counsel was at times inaudible to the jury.  (Resp.

Ex. C. at 25).  The court accurately noted that at the close of the prosecution's case,

the following colloquy occurred:

> THE COURT: [Defense counsel], if you'll approach the bench.  Just a
> note from the jury that they would like you to speak up.  I didn't want to
> embarrass you.
>
> DEFENSE COUNSEL: I'm beyond that.  Thank you.

(Resp. Ex. C at 26).  The court found that "[t]he record here does not indicate what, if

any, portion of the proceedings was not heard by the jury.  Also, we are unpersuaded

that the absence of the jury's note visits any hardship or prejudice upon defendant.  We

therefore perceive no reversible error."  (Resp. Ex. C at 26).

Habeas relief cannot be granted "unless the trial court's ruling 'render[ed] the trial so fundamentally unfair as to constitute a denial of federal constitutional rights.'" Parker v. Scott, 394 F.3d at 1317 (quoting Elliott v. Williams, 248 F.3d 1205, 1214 (10th Cir. 2001)).  When engaging in this fundamental fairness analysis, the court must examine the proceedings as a whole.  Id.  A review of the record concerning this matter merely shows the colloquy quoted above by the CCA (Vol. 15, p. 87, lines 22-25, to p. 88, line 1), which does not indicate that the jury missed any evidence, only that they asked defense counsel to speak up.  The CCA's ruling was not contrary to nor an unreasonable application of established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Therefore, habeas relief is not warranted on this claim as well.

**(9) Part of Trial Conducted Outside of Petitioner's Presence.**  Petitioner next asserts that he was deprived of his constitutional right to be present when the court conducted part of the trial proceedings outside of his presence.  More specifically, outside of the petitioner's presence, the court discussed the failure to appear by one of the petitioner's subpoenaed witnesses, and a warrant was issued for her arrest. According to the petitioner, the court required the prosecution to assist in finding this witness, ultimately she was not called as a witness at trial, and there was no further discussion of her on the record.  Petitioner claims that this witness[2] was critical to his

---

[2]The witness who failed to appear was Theresa McIntosh who worked as a bartender at Jordenelli's bar on the night of the shooting.  According to the petitioner, this witness "told police that [petitioner] arrived at Jordenelli's at approximately 10:45

38

defense, would have bolstered his intoxication defense, and would have, at a minimum,

tended to refute the "after deliberation" element of first degree murder.

The CCA concluded that the trial court did not violate the petitioner's due

process rights in conducting the hearing in his absence. (Resp. Ex. C at 28). The

court stated:

> Here, the matter at hand was of a ministerial nature. Defense
> counsel was present and obtained the arrest warrant he sought. There
> were no unusual circumstances or unexpected developments during the
> hearing. Furthermore, defense counsel expressly stated that it was not
> necessary for defendant to be present.
>
> Defendant argues that he could have been of assistance to
> counsel concerning this absent witness. However, the types of
> assistance mentioned in defendant's brief all relate to proceedings that
> took place at later stages of trial, such as during the defense's case-in-
> chief. Defendant makes no showing of how he could have meaningfully
> participated in the actual proceedings from which he was absent.
>
> In sum, defendant's absence from the hearing concerning issuance
> of the arrest warrant did not thwart the conduct of a fair and just
> proceeding, and any benefit defendant might have obtained from
> attending the hearing was nebulous at best. . . .

(Resp. Ex. C at 28).

"Although a defendant has a due process right 'to be present . . . whenever his

presence has a relation, reasonably substantial, to the fullness of his opportunity to

defend against the charge,' this right does not require that a defendant be present at all

proceedings. . . .   Instead, the constitutional right to be present exists 'to the extent that

---

p.m. and left sometime after 1:00 a.m..  He drank beer and then switched to mixed
drinks.  She stopped serving him liquor a little before 1:00 a.m. 'bar time' because he
had had enough to drink.  When he left the bar, he was not angry at all.  He indicated
that he was tired and was going home to get some sleep."  (Pet. at 6(e)).

a fair and just hearing would be thwarted by his absence, and to that extent only.'"
Bland v. Sirmons, – F.3d –, 2006 WL 2171516, *15 (10th Cir. Aug. 3, 2006) (quoting
Snyder v. Massachusetts, 291 U.S. 97, 105-06, 107-08 (1934), overruled in part on
other grounds, Malloy v. Hogan, 378 U.S. 1 (1964)). "When the defendant's 'presence
would be useless, or the benefit but a shadow,' due process does not require the
defendant's presence at a trial proceeding. . . .  In determining whether exclusion of a
defendant from a proceeding violated due process, [the court] consider[s] the
proceedings 'in light of the whole record.'" Id. (quoting Snyder, 291 U.S. at 106-07;
United States v. Gagnon, 470 U.S. 522, 526-27 (1985)).

Here, petitioner has not shown how his presence during this part of the
proceeding would have been beneficial.  Respondents correctly state that no
substantive matters relating to the charges pending against the petitioner were
discussed.  As the CCA found, the matter was of a ministerial nature, defense counsel
was present and obtained the arrest warrant he sought, and there were no unusual
circumstances or unexpected developments during the hearing.  Furthermore, defense
counsel expressly stated that it was unnecessary for the petitioner to be present.
Petitioner's absence during this discussion does not constitute a constitutional
violation.  The state court's decision was not contrary to or involve an unreasonable
application of clearly established federal law, nor was it an unreasonable determination
of the facts in light of the evidence.  Therefore, this claim does not constitute a basis for
habeas relief.

**(10) State's Introduction of Victim's Hearsay Statements and Evidence of**

**Her Character.**[3]  Petitioner states that over defense objection, the court allowed the

testimony of the victim's best friend, Reheana Unrein, that the victim told her that her

"relationship [with petitioner] was a little rocky, she was having problems with that, she

was worried about that."  (Pet. at 6(f)).  According to the petitioner, the court ruled that

the testimony was admissible as to the victim's state of mind, which petitioner asserts

unconstitutionally deprived him of his right to confrontation.

The CCA described the "state of mind" exception to the hearsay rule and then

found:

> it appears that both of the challenged statements were hearsay.
> Moreover, as a recounting of the victim's description of past events, these
> statements do not fall within the "state of mind" exception of CRE 803(3).

> However, because the record is replete with references to
> arguments between the victim and defendant, the brief reference
> complained of here were cumulative and did not affect defendant's
> substantial rights.  Thus, any error was harmless.

(Resp. Ex. C at 29-30).

As stated previously, "[e]videntiary rulings by a state court cannot serve as the

basis for habeas corpus relief unless the ruling rendered the petitioner's trial

fundamentally unfair resulting in a violation of due process."  <u>Brewer v. Northern Dist.</u>

<u>of Okla. Mike Mullin</u>, 169 Fed.Appx. 517, **2 (10th Cir. 2006) (citing <u>Duckett v. Mullin</u>,

---

[3]While petitioner's heading for this claim states he "was deprived of his right to
confrontation when the trial court allowed the State to introduce Ms. Jenkins' hearsay
statements and evidence of her character" (Pet. at 6(f)), in the subsequent statement of
supporting facts, petitioner makes no mention of any evidence of the victim's character.
Instead, he merely addressed the introduction of evidence regarding the relationship he
had with the victim.  Therefore, this court has addressed only the petitioner's argument
concerning the hearsay evidence of the relationship.

306, F.3d 982, 999 (10th Cir. 2002); <u>Fox v. Ward</u>, 200 F.3d 1286, 1296-97 (10th Cir.

2000) (stating that to justify habeas relief, a trial court's evidentiary error must be "so

grossly prejudicial that it fatally infected the trial and denied the fundamental fairness

that is the essence of due process")).  Petitioner here has not established that the trial

court's ruling rendered his trial fundamentally unfair.

As noted by the CCA, the record is replete with references to arguments

between the victim and the petitioner, and thus the brief reference complained of here

was cumulative and did not affect the petitioner's substantial rights.  In this regard, the

respondents correctly note that the witness testified about her personal observations of

the petitioner and the victim arguing (see Vol. 12, p. 60, line 19), and even defense

counsel elicited testimony from the witness on cross-examination that the petitioner and

the victim bickered a lot.  (Vol. 12, p. 84, lines 5-19).  In addition, the victim's daughter

testified that she observed her mother and the petitioner argue.  (Vol. 12, p. 42, line

12). As respondents note, this additional testimony came from personal observations of

the witnesses and was not challenged on appeal or in the present case.  Furthermore,

in his recorded statement to the police, which was played to the jury, the petitioner

repeatedly made statements about their argumentative relationship.  For example,

petitioner stated that "we've been fighting for a month;" they had "been arguing for the

last thirty days about seeing each other;" it "seems like her and me were always

arguing every [sic] since we met;" and "hell, we always argued."  (Vol. 20).  Therefore,

the challenged testimony that the victim told the witness that she and the petitioner

argued is *de minimus* and did not deprive the petitioner of a fair trial.  This court finds

42

that the state court's decision was not contrary to or involve an unreasonable

application of clearly established federal law, nor was it an unreasonable determination

of the facts presented in the state court proceeding.  Therefore, this claim does not

warrant habeas relief.

**(11) Improper Jury Instruction on "After Deliberation" and the Affirmative**

**Defense of Intoxication.**  Petitioner next asserts that "[r]eversible constitutional plain

error occurred when the jury was inproperly [sic] instructed on 'after deliberation' and

the affirmative defense of intoxification [sic]."  (Pet. at 6(f)).  Petitioner asserts that

> [t]he trial court instructed the jury according to statute of the proper
> definition of "after deliberation" . . . .  However, the court limited the
> applicability of the intoxification [sic] defense to only a portion of the mens
> rea for the first degree murder, the common element of all specific intent
> crimes, the acting with "intent." See, C.R.S., § 18-1-501(5) (a person acts
> "with intent" when his conscious objective is to cause the specific result
> proscribed by the statute defining the offense).  The jury was not
> instructed that intoxification [sic] was an affirmative defense to the
> requisite "after deliberation" element.
>
>         The instructions given, limit the affirmative defense of intoxification
> [sic] to the element of "intent to cause the death."  The instructions do not
> inform the jury that intoxification [sic] is likewise an affirmative defense to
> the element of "after deliberation." . . .

(Pet. at 6(f)) (citation to record omitted).

        In petitioner's fifteenth claim for habeas relief, he similarly asserts that the jury

was not instructed that evidence of voluntary intoxication can negate the "after

deliberation" portion of the specific intent element of first degree murder.  He contends

that:

> [e]vidence of voluntary intoxification [sic] is admissable [sic] to negate
> specific intent.  First degree murder after deliberation is a specific intent

43

> crime.  The culpable mental state for that crime is that the murder was committed "[a]fter deliberation and with intent to cause the death of a person other than himself."  The instructions to the jury need to tell the jury that it can apply evidence of voluntary intoxification [sic] to negate any part of that mental state, including "after deliberation,' The Petitioner's jury was not so instructed, in violation of due process.  The error required reversal, and the Petitioner on remand should have been sentenced to second degree murder.

(Pet. at 6(k)).  Petitioner unsuccessfully raised this issue in his Rule 35(c) post-

conviction motion before the district court.

On direct appeal, the CCA disagreed with the petitioner's contention that the trial

court committed plain error in instructing the jury that, as to the charge of first degree

murder, intoxication constitutes an affirmative defense to the element of intent but not

to the element of deliberation.  (Resp. Ex. C at 31).  The court stated, "In People v.

Orona, 907 P.2d 659 (Colo. App. 1995), a division of this court considered this issue

and concluded that the elements of intent and deliberation in §18-3-102(1)(a) are

separate and distinct from each other, and that intoxication provides an affirmative

defense to the former but not to the latter.  We consider that holding dispositive of this

issue."  (Resp. Ex. C at 31).

In an unpublished opinion (see Resp. Ex. K), the CCA affirmed the denial of the

petitioner's 35(c) motion.  The court noted that the petitioner raised this issue on direct

appeal, and a division summarily rejected it based on the opinion of another division of

the court in People v. Orona, 907 P.2d 659 (Colo. App. 1995).  The court further noted

that the Colorado Supreme Court subsequently "disapproved of Orona to the extent

that it held that 'after deliberation' is not a part of the culpable mental state of first

degree murder.'" (Resp. Ex. K) (citing People v. Harlan, 8 P.3d 448, 474-75 (Colo. 2000)).  The court thus concluded that it could exercise its discretion to review the issue.  (Resp. Ex. K at 2).  However, upon review of the record, the court concluded that there was no reversible error.  (Resp. Ex. K at 2).  The court stated:

> Where a defendant does not object to a trial court's jury instructions, a plain error standard is applied in reviewing those instructions.  With respect to alleged instructional error, reversal under a plain error standard requires that a defendant demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to the conviction. . . .

> We recognize that the instruction given here complied with the law as announced at the time of trial; nevertheless, we conclude that a plain error analysis is appropriate.

> We reject defendant's assertion that his contention raises an issue of constitutional magnitude that must be reviewed under the harmless error standard enunciated by the supreme court in People v. Harlan, supra.  In Harlan, the defendant's contention regarding the alleged lowering of the prosecution's burden of proof was reviewed for harmless error because he had preserved the issue for appeal by proper objections.  See People v. Harlan, supra, 8 P.3d at 472.

> In contrast, defendant here did not raise any objection to the instructions at the time of trial.  Moreover, he does not contend that the jury was given an improper elemental instruction for the offense of first degree murder. . . .  Therefore, we review defendant's contention for plain error.

> In People v. Harlan, supra, the supreme court explained that evidence of voluntary intoxication is not an affirmative defense to a charge of first degree murder, but rather such evidence may negate the specific intent for that offense.  The court went on to disapprove People v. Orona, supra, and reaffirm that the concepts of "with intent" and "after deliberation" are both part of the specific intent element of first degree murder.  The court then reviewed the instructions there given to the jury and concluded that the jury was specifically instructed that it could consider whether intoxication prevented the defendant from deliberating prior to killing the victim. . . .

Here, the instruction on first degree murder informed the jury that the prosecution had to establish that defendant acted "with intent to cause the death of [the victim], and after deliberation, caused the death of [the victim], without the affirmative defense [of intoxication]."

The instructions defined "intent" and "with intent."  The instructions defined the term "after deliberation" to mean "not only intentionally but also that the decision to commit the act has been made after the exercise of reflection and judgment concerning the act" (emphasis added).  Further, "judgment" was defined as "the mental or intellectual process of forming an opinion or evaluation by discerning or comparing."

The instructions also defined intoxication, in pertinent part, as "a disturbance of mental or physical capacities."  The jury was further instructed: "It is an affirmative defense to the crime of first-degree murder that the accused, because of intoxication, did not have the capacity to form the specific intent required by that offense."  In addition, the jury was instructed that the prosecution had to prove the guilt of defendant beyond a reasonable doubt as to the affirmative defense, as well as to each and every element of the charged offense of first degree murder.  Finally, the record reflects that both parties in closing argument discussed at some length the intoxication evidence in terms of its impact on both defendant's intent and his ability to deliberate.

The jury was adequately informed, through both the instructions and the arguments of counsel, that to find defendant guilty of first degree murder, it must determine that the prosecution had proven both intent and deliberation beyond a reasonable doubt.  The instructions on "after deliberation" included both the concept of "intentionally" and "the exercise of reflection and judgment," defined in part as a mental process.

The instructions then specified that intoxication, a disturbance of mental capacity, was an affirmative defense to the issue of "specific intent."  The terms "with intent" and "specific intent" were both used in the instructions, but only "intentionally" and "with intent" were defined.  The elemental instruction for first degree murder required the prosecution to prove that the defendant acted "with intent" and "after deliberation" beyond a reasonable doubt.

Defining "intoxication" as an affirmative defense to "specific intent" and requiring that it be disproved beyond a reasonable doubt resulted, if anything, in a higher burden of proof on the prosecution.  The prosecution not only had to prove both elements of intent, "with intent" and "after

deliberation," beyond a reasonable doubt, but it also had to prove, beyond a reasonable doubt, that defendant was not too intoxicated to intend to kill the victim or to deliberate doing so.

Therefore, we conclude that, even assuming error in the instructions as given, there is no reasonable possibility that it contributed to defendant's conviction, and no plain error occurred here.

Therefore, the order is affirmed.

(Resp. Ex. K).

"A § 2254 petitioner has a heavy burden in attempting to set aside a state conviction based on an erroneous jury instruction . . . .  As a general rule, errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'" Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997) (internal citations omitted) (quoted by Patton v. Mullin, 425 F.3d 788, 807 (10th Cir. 2005), cert. denied sub nom. 126 S.Ct. 2327 (2006)).  Upon review of the jury instructions in this case, this court finds that the instructions at issue do not meet this standard.  The court agrees with the respondents taken as a whole, the effect of the instructions (see Vol. 1 at 109-29) was to require the prosecution to prove all of the following elements beyond a reasonable doubt: (1) the petitioner had the conscious objective to kill the victim (Instruction No. 10); (2) he killed the victim after thoughtful consideration or meditation, after forming the intent, and after going through a mental or intellectual process of forming an opinion or evaluation by discerning or comparing (Instruction No. 12); and (3) he was not so intoxicated that he did not have the capacity to form the conscious objective to kill the victim (Instruction No. 14).  Furthermore, as

shown above, the CCA thoroughly reviewed the instructions at issue, and this court

finds that the decision was not contrary to or involve an unreasonable application of

clearly established federal law, nor was it an unreasonable determination of the facts

presented in the state court proceeding.

The court notes the petitioner's supplement to his petition (Docket No. 21) in

which he notes an unreported decision of the CCA, People v. Michael Miller, No. 01 CA

1026, 2004 WL 916226 (Colo. App. Apr. 29, 2004), which petitioner claims deals with

the same issue as in his fifteenth claim for habeas relief.  After the petitioner's

supplement was filed, however, the Colorado Supreme Court reversed the CCA's

decision in Miller, People v. Miller, 113 P.3d 743 (Colo. June 6, 2005), reh'g denied

(June 27, 2005), cert. denied sub nom. Miller v. Colorado, 126 S. Ct. 663 (Nov. 14,

2005).  The Colorado Supreme Court stated in pertinent part:

> Affirmative defenses admit the doing of the act charged but seek to justify,
> excuse, or mitigate it. . . .  Affirmative defenses . . . do not simply
> challenge the existence of an element of the offense, but seek to justify or
> mitigate the entire crime, and are therefore complete defenses. . . .
>
> To the contrary, voluntary or self-induced intoxication is not an
> affirmative defense . . ., but evidence of intoxication may "negative the
> existence of a specific intent if such intent is an element of the crime
> charged." . . .  First-degree murder (after deliberation) is a specific intent
> crime.  A person commits the crime of murder in the first degree if, "after
> deliberation and with the intent to cause the death of a person", he
> causes the death of that person. . . .
>
> Accordingly, evidence of voluntary intoxication is admissible to
> counter the specific intent element of first-degree murder.  "After
> deliberation" and "intent" are two distinct elements, which together
> constitute the specific intent mental state of first-degree murder. . . .  The
> statute defines the term "after deliberation" to mean "not only intentionally
> but also that the decision to commit the act has been made after the

48

exercise of reflection and judgment concerning the act." . . .  Because the statute indicates that the mental state of "after deliberation" includes intent, the mental state for first-degree murder is distinguished by the requirement of "reflection and judgment." . . .  Voluntary intoxication, therefore, bears upon both "after deliberation" and "intent."

. . .

. . . [T]he trial court provided general definitions of "after deliberation" and "intent." . . . the court set forth the elements of first-degree murder, as including both intent and after deliberation. . . . the court [also] charged the jury that:

> You may consider evidence of self-induced intoxication in determining whether or not [s]elf-induced intoxication negates the existence of the culpable mental state of specific intent.

> The prosecution has the burden of proving all the elements of the crimes charged.  If you find the defendant was intoxicated to such a degree that he did not form the specific intent which is a required element of Murder in the First-degree After Deliberation and Theft you should find the defendant not guilty of those charges.

The court did not instruct that "specific intent" includes both "intent" and "after deliberation."  The court should have framed the instruction to clarify that if the jury found the defendant was intoxicated to such a degree that he did not form the intent or that he did not deliberate, both of which are required elements of Murder in the First-degree After Deliberation, the jury should find the defendant not guilty of that charge. That is the fundamental thrust of our holding on this point in *Harlan*.  In *Harlan*, we found the error not to be reversible because, when looking at the instructions as a whole, the court did direct the jury to consider evidence of voluntary intoxication as it related both to intent and to deliberation.[fn11] [fn 11.  In contrast, in *Sepulveda*, we found reversible error where the trial court affirmatively misinstructed the jury that "the defendant's self-induced intoxication is *not* a defense to "after deliberation'."  *See* 65 P.3d at 1005-6 (emphasis added).]

In sum, when a voluntary intoxication instruction is warranted, the trial court should affirmatively instruct the jury that "after deliberation" is part of the culpable mental state required by first-degree murder and may

be negated by evidence of voluntary intoxication.

People v. Miller, 113 P.3d at 750-51 (citations omitted).  Like the CCA here, the

Colorado Supreme Court in Miller then reviewed the error under a plain error standard

of review.  Id. at 751.  After reviewing the record, the court determined that the

instructional error did not rise to the level of plain error.  Id. at 752.

The Miller ruling does not change this court's finding above concerning the

instructions in this case.  While the trial court here did not affirmatively instruct the jury

that "after deliberation" may be negated by evidence of voluntary intoxication, this court

agrees with respondents that the instructions as a whole did not restrict the jury in any

way from considering evidence of intoxication as to whether the petitioner was capable

of deliberating about killing the victim.  Once again, this court finds that the instructions

in this case were not so fundamentally unfair as to deprive petitioner of a fair trial and

to due process of law and that the CCA's decision was not contrary to or involve an

unreasonable application of clearly established federal law, nor was it an unreasonable

determination of the facts presented in the state court proceeding.  Therefore, claims

11 and 15 of the petition, as supplemented, do not warrant habeas relief.

**(12) Failure to Instruct on the Lesser Offense of Heat of Passion**

**Manslaughter.**  Petitioner contends that in light of the State's theory that he shot the

victim because they were arguing and he was angry or jealous, it was incumbent upon

the court to *sua sponte* instruct the jury on the lesser offense of heat of passion

manslaughter.  See § 18-3-104(1)(c), C.R.S.  He asserts that "[s]ince the jury was not

required to examine whether [his] mens rea and actus reus constitutted [sic] heat of

50

passion manslaughter, rather that [sic] first degree murder, serious doubt is cast on the reliability of the jury's verdict. . . ."  (Pet. at 6(g)).

The CCA found no merit to this contention.  (Resp. Ex. C at 31).  The court found that "the record contains no evidence that the victim committed [a serious and highly provoking act] immediately before defendant killed her.  Thus, an instruction on heat of passion would have been inappropriate even had defendant requested it."  (Resp. Ex. C. at 32).

"The Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases . . . and neither has [the Tenth Circuit Court of Appeals].  [Tenth Circuit] precedents establish a rule of 'automatic non-reviewability' for claims based on a state court's failure, in a non-capital case, to give a lesser included offense instruction."  Dockins v. Hines, 374 F.3d 935, 938 (10th Cir. 2004).  Therefore, habeas relief is not warranted on this ground.

**(13) Cumulative Error.**  Petitioner lists several instances of purported prosecutorial misconduct and asserts that their cumulative effect deprived him of a fair trial.  This alleged misconduct consisted of:  (1) the prosecutor preventing defense counsel from mentioning in his opening statement the petitioner's statement to the police, (2) the prosecutor improperly implied during his opening that the petitioner was motivated by jealousy when he shot Rose Jenkins when there was no supporting evidence for that statement; (3) during voir dire the prosecutor used misleading analogies to explain the concept of "after deliberation" in a manner designed to lessen the State's burden of proof on that element; (4) the prosecutor asked improper

questions of the victim's daughter which were designed to trigger emotion from the witness and sympathy from the jury; (5) the prosecutor improperly offered into evidence before the jury an obviously inadmissible photograph of the victim with her daughter; (6) Detective Grose testified to matters in violation of an existing court order; (7) in his closing argument, the prosecutor based the State's case for "after deliberation" on non-existent physical evidence; and (8) in his closing argument, the prosecutor improperly argued in a manner calculated to inflame the passions or prejudices of the jury when he stated that "I'm not going to suggest to you for one minute that [petitioner] wasn't upset about blowing rose Jenkins' brains out, something so heinous as that."

The CCA disagreed with the petitioner's assertion that the cumulative effect of instances of alleged prosecutorial misconduct during argument denied him his right to a fair trial.  The court stated:

> Defendant argues that the prosecutor misstated the evidence during the opening statement when he claimed that defendant was motivated by jealousy when he shot the victim.  We disagree.
>
> The victim's daughter and a friend of the victim both testified that defendant was jealous of the victim's former boyfriend.  In view of this evidence, it was reasonable for the prosecution to suggest an inference that this jealousy motivated defendant in killing the victim.  This argument was therefore not improper. . . .
>
> Defendant asserts that the prosecutor misstated the law during jury voir dire when he referred to the avoidance of a traffic collision as an example of 'deliberation.'  We perceive no reversible error.
>
> Inaccuracies in counsel's statements of the law may be corrected by the court's instructions to the jury.  Absent a contrary showing, it is presumed that the jury heeds such instructions. . . .
>
> Here, the prosecutor's choice of words during voir dire cannot fairly

52

be interpreted as an attempt to define for the jury the element of deliberation.  Moreover, the court properly instructed the jury as to the meaning of the term deliberation.  There is nothing in the record to indicate that the jury disregarded this definition in favor of the comments the prosecutor made during jury selection. . . .

Defendant also contends that the prosecutor improperly mischaracterized the evidence and appealed to the passions of the jury during closing argument when he referred to the shooting as "blowing [the victim's] brains out."  Again, we perceive no reversible error.

When the prosecutor made this statement, defense counsel objected, saying "That's not what happened.  That's not what the testimony was."  By sustaining this objection, the court sufficiently indicated to the jury that it agreed with defense counsel that the prosecutor had misstated the evidence and that the comment was improper.

We conclude that these challenged comments of the prosecutor in closing argument were either not improper or, if so, were cured by the court's sustaining of objections or by is instructions to the jury.  Thus, considered individually or collectively, the statements do not warrant reversal of defendant's conviction.

(Resp. Ex. C at 7-9).

Petitioner next asserts that the cumulative effect of all of the errors raised above in the instant petition deprived him of his constitutional right to a fair trial.  The CCA disagreed with petitioner's contention.  (Resp. Ex. C at 33).  The court stated that "upon reviewing the record and considering defendant's various contentions of error both individually and collectively, we conclude that defendant was not deprived of a fair trial."  (Resp. Ex. C. at 33).

This court must defer to the CCA's rulings "unless [they] constitute[] an unreasonable application of the cumulative-error doctrine."  Thornburg v. Mullin, 422 F.3d 1113, 1137 (10th Cir. 2005).  "'A cumulative error analysis aggregates all the

53

errors that individually might be harmless, and it analyzes whether their cumulative

effect on the outcome of the trial is such that collectively they can no longer be

determined to be harmless.'" Id. (quoting United States v. Wood, 207 F.3d 1222, 1237

(10th Cir. 2000)).  Cumulative error is reviewed to determine whether the alleged errors

"as a whole 'so infected the trial with unfairness as to make the resulting conviction a

denial of due process.'" Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643

(1974)).  Having reviewed the entire record, this court finds that the CCA's rulings do

not constitute an unreasonable application of the cumulative-error doctrine, nor were

they unreasonable determinations of the facts presented in the state court proceeding.

Therefore, these two cumulative error claims do not warrant habeas relief.

**WHEREFORE,** for the foregoing reasons, it is hereby

**RECOMMENDED** that the Application for a Writ of Habeas Corpus Pursuant to

28 U.S.C. § 2254 by a Person in State Custody (Docket No. 3) as supplemented

(Docket Nos. 21 and 23) be **DENIED** and **DISMISSED WITH PREJUDICE**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the**

**parties have ten (10) days after service of this recommendation to serve and file**

**written, specific objections to the above recommendation with the District Judge**

**assigned to the case.  The District Judge need not consider frivolous, conclusive,**

**or general objections.  A party's failure to file and serve such written, specific**

**objections waives *de novo* review of the recommendation by the District Judge,**

**Fed. R. Civ. P. 72(b), Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives**

**appellate review of both factual and legal questions.  Makin v. Colorado Dep't of**

54

**Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411,**

**1412-13 (10th Cir. 1996).**


Dated:      August 21, 2006           s/ Michael J. Watanabe
            Denver, Colorado          Michael J. Watanabe
                                      United States Magistrate Judge